LOWENSTEIN & THOMAS, Respondents, v. WABASH RAILROAD COMPANY, Appellant.

Kansas City Court of Appeals, June 3, 1895.

1. **Common Carriers**: LIVE STOCK: CARE. A carrier of live stock must afford opportunity for feeding and watering the same though the contract imposes the duty of feeding and watering upon the shipper. He must exercise a different care from that given to inanimate freight and use a reasonable degree of skill and diligence to preserve them, putting himself in the place of the owner for that purpose.

Lowenstein & Thomas v. Wabash R'y Co.

2. ———: ———: ———. While the shipper has no right to designate the time and place the train should be stopped to allow him to feed and water, in this case the uncontradicted evidence shows a uniform and invariable custom in shipments of the kind in controversy, to stop at Kansas City, and beside, the express contract required the same.

3. ———: EVIDENCE: BILL OF LADING. If a bill of lading covers the point for watering and feeding stock, oral evidence would be inadmissible to show a different place by the agreement or custom, but the bill of lading in this case did not designate the place where such feeding and watering should take place, and parol evidence is admissible to show an agreement or custom.

*Appeal from the Jackson Circuit Court.*—HON. E. L. SCARRITT, Judge.

AFFIRMED.

*F. W. Lehmann* and *Geo. S. Grover* for appellant.

(1) In actions of this character, where the execution of the special contract is admitted, the defendant is no longer liable as a common carrier, and, therefore, the burden is upon the plaintiffs to establish the negligence of the defendant, in order to recover for any injury received. *Clark v. Railroad*, 64 Mo. 440; *McBeath v. Railroad*, 20 Mo. App. 445; *Railroad v. Sherwood*, 132 Ind. 129. (2) And this burden is not shifted to the defendant by the mere proof that an injury occurred to the animals while in transit, without further testimony that such injury was not the result of a breach of contractual duty on the part of the shipper. Authorities cited under point 1, *supra*. (3) The special contract in evidence, supported, as it was shown to be, by a good consideration is valid, and under it the duty of feeding and watering the stock while in transit devolved upon the plaintiffs, and not upon the defendant. For that reason, a recovery below should not have been permitted. *McFaddin v. Railroad*, 92 Mo. 343; *Penn v. Railroad*, 49 N. Y. 204; Wheeler on

Carriers, p. 102, and cases cited; *Duvenick v. Railroad,* 57 Mo. App. 558. (4) The plaintiffs could have avoided all injury to their stock by caring for them while in transit, as they had undertaken to do. The damage here sued for is the result of their own breach of contract, for which they ought not to be rewarded. *Douglas v. Stephens,* 18 Mo. 362; *Penn v. Railroad, supra; Railroad v. Sherwood, supra; Atchison v. Railroad,* 80 Mo. 213; *Myers v. Railroad,* 90 Mo. 98. (5) It is wholly immaterial what the custom was, at the time this shipment was made, as to feeding and watering live stock while in transit, at Kansas City. This usage, whatever it may have been, was abrogated by the express agreement of the parties in this case. *Kimball v. Brawner,* 47 Mo. 399; *Wolff v. Campbell,* 110 Mo. 119; *Evans v. Mfg Co.,* 118 Mo. 554. (6) All of the prior parol negotiations, as to shipment, between the plaintiffs and defendant, were merged in, and controlled by, the special contract subsequently executed. *O'Brien v. Kinney,* 74 Mo. 125; *Railroad v. Cleary,* 77 Mo. 634; *Brown v. Railroad,* 18 Mo. App. 574; *Turner v. Railroad,* 20 Mo. App. 635; *Iron Co. v. Iron Co.,* 29 Mo. App. 537; *Welsh v. Edmisson,* 46 Mo. App. 286.

*I. J. Ringolsky* and *Elijah Robinson* for respondent.

(1) We admit that we contracted to unload and feed and water the stock; but we insist defendant was at fault in failing to afford us an opportunity to do so. (2) Plaintiffs could not care for the stock while in transit, because defendant would not give them an opportunity to do so. The authorities cited under the fourth subdivision of appellant's brief have no bearing on this question involved in this case. (3) The evidence of custom as to stopping stock at Kansas City and running it into the stock yards to be unloaded, fed

and watered, was not introduced for the purpose of contradicting or varying the terms of the written contract, but for the purpose of showing what defendant's duty was concerning a matter about which the contract was silent, and was clearly admissible. *S. W., etc., Co. v. Standard*, 44 Mo. 71; *Rollins v. Classbrook*, 22 Mo. 405; *Moss v. Green*, 41 Mo. 389. (4) Evidence of conversation that took place at the time the contract was entered into, and prior thereto, was not offered to vary or contradict the contract, but to show that defendant knew plaintiffs were expecting the stock to be stopped at Kansas City, to be fed and watered. (5) On the undisputed facts in this case, the plaintiff was entitled to recover. *Duvenick v. Railroad*, 57 Mo. App. 550. *Kimball v. Brawner*, 47 Mo. 399; *McAlister v. Railroad*, 74 Mo. 352; *Railroad v. Higgie*, 86 Ga. 210; *Railroad v. Ives*, 23 S. W. Rep. 8; *Railroad v. Montgomery*, 16 S. W. Rep. 178; Hutchinson on Carriers, secs. 322, 324.

GILL, J.—On the twenty-sixth day of May, 1892, Lowenstein & Thomas shipped thirty-six head of horses and mules from St. Louis over the Wabash road, consigned to El Reno, Oklahoma Territory. The animals were loaded in two cars at St. Louis, and at about 5 o'clock P. M., were hauled through to Kansas City, arriving there on the twenty-seventh, and thence taken by the Rock Island road to Oklahoma. The complaint is that the defendant failed to stop the stock at Kansas City and permit them to be fed and watered, but caused them to be carried forward without feed, water, rest or change, to Wichita, Kansas, where they arrived the morning of the twenty-ninth of May; and whereby they were greatly damaged. For this damage this suit was brought, resulting in a verdict and judgment for $379 in plaintiff's favor, and defendant appealed.

The principal contention is that the trial court, at

the close of the evidence, ought to have given a peremptory instruction for the defendant. It becomes necessary, then, to state more in detail the facts disclosed at the trial. There was little, if any, conflict in the testimony, which was in effect as follows:

Plaintiff Thomas (who was and is a stock dealer and shipper of twenty-five years' experience, and who had, on frequent occasions, shipped horses and mules over this and other roads from St. Louis west and south through Kansas City) made arrangements with defendant's agent at St. Louis for carrying the stock in question. At the time of making the arrangement with the Wabash Railway Company's agent at St. Louis for the shipment of the stock as aforesaid, the plaintiff informed the agent of the railway company that he desired to have the stock unloaded at Kansas City, for the purpose of feeding and watering them, and to this the agent consented. This conversation occurred with Mr. Ramsay, the defendant's agent, with whom the contract was made for the shipment of the stock. Plaintiff also had a conversation with the agent of defendant, who prepared the bill of lading, and stated the same thing to him; whereupon said agent informed plaintiff that it was not necessary that the bill of lading should contain anything about stopping the horses and mules at Kansas City for the purpose of being watered and fed—that that was always put in the way-bill. The uncontradicted evidence in the case shows that for years it had been the uniform custom of the defendant railway company, as well as other companies, whose roads are similarly located, when shipping stock from St. Louis to points south and west of Kansas City, to unload them at Kansas City for the purpose of being watered and fed. The uncontradicted evidence in the case also shows that the stock in question was shipped in ordinary freight cars, and it was impossible to water

and feed them, unless they were unloaded; that the universal custom as to watering and feeding stock at Kansas City, was for the railroad company to run the cars into the stock yards, and the stock yards employees would thereupon unload the stock, feed and water them, and reload them; and that all of these facts were known to the defendant. Plaintiff did not come with the stock from St. Louis to Kansas City, but instead thereof, came on a passenger train—a fact which was known to defendant, as it furnished him a pass on a passenger train. Upon reaching Kansas City on the morning of the twenty-seventh, he arranged with the stock yards people to water and feed the stock as soon as it should be set into the yards by the Wabash Company. Thomas testified that the running time of stock and freight trains from St. Louis to Kansas City was usually from twenty-four to thirty hours, though according to the time table the train ought to have arrived at about 11 o'clock A. M. on the next day after leaving St. Louis. At what hour it did arrive with the stock in question is not fixed by the evidence; though it was likely before 1 o'clock on the twenty-seventh, as that was the schedule time for the Rock Island to leave for Oklahoma. But at whatever hour the Wabash train reached Kansas City, plaintiffs had arrangements for unloading, feeding and watering the animals at the stock yards. Instead, however, of setting the stock into the yards, to give the stock yards people an opportunity to water and feed them, the Wabash Railroad Company turned the cars of stock over to the Rock Island Railroad Company, and they were, during the same day, sent on their journey toward El Reno, without the stock having had any water or feed whatever. Upon ascertaining this fact, the plaintiff, Thomas, followed on after the stock as soon as he could and overtook it at Wichita, where the Rock Island Company had unloaded it for

the purpose of being watered and fed. The stock had then been fifty-six or fifty-eight hours on the train without feed or water, and the evidence shows that in consequence thereof they were very badly damaged.

The bill of lading, or contract of carriage, recited that the stock was to be transported at a price admitted to be a reduced rate; and that, in consideration thereof, the shippers were to load and unload, and to feed and water, the stock at their own risk and expense, but when and where such feeding and watering was to be done was not set out in the contract. It was further stipulated in the bill of lading, that the Wabash Company should not be responsible for any damage or injury to said stock, after the same shall have left the line of its road, etc.

By the evidence now, it is clearly established: *First.* That plaintiffs arranged with defendant's agents at St. Louis to transport the horses and mules, and with the distinct oral understanding that plaintiffs should be given an opportunity to feed and water the same at Kansas City, before sending them further on; *second,* that defendant's servants and agents failed so to do; and, *third,* that, by reason of such failure, the stock were so famished and distressed as greatly to impair their value. It would seem, then, that, unless defendant was, in some way, relieved from the obligation, it ought to be held to make good the plaintiff's loss. This relief is claimed under, and by virtue of, the terms of the special written contract which the defendant entered into with the plaintiffs, wherein the duty of watering and feeding the stock, while in transit, was imposed on the shipper and not on the carrier.

This contention would possess more merit if the damage were attributable to the failure of the plaintiffs to comply with their undertaking. It is true that plaintiffs did agree to feed and water; but, it was the duty

of the defendant to afford plaintiffs an *opportunity* for such performance. The cars in which the animals were loaded were not of that improved pattern that would allow the stock to be therein watered and fed. They had to be unloaded for that purpose. If defendant had given the opportunity and plaintiffs had then failed to avail themselves thereof, then they would have no cause to complain of the defendant. But that is not this case. Here the plaintiffs were ready and prepared to feed and water at the place designated and agreed on, but the defendant refused to stop the cars and permit plaintiffs to unload, feed and water. The written contract did not attempt to exempt defendant from its obligation to allow the plaintiffs a fair opportunity to properly care for their stock. And it may be well doubted if such a stipulation could be enforced, even if written in the contract, since the effect would be to allow the carrier to contract against its own gross negligence. The carrier of live stock must exercise a different care from that given to inanimate freight. "They absolutely require ventilation, and to be fed and watered; and if the carrier has not provided otherwise by contract with the owner, when he accepts them for transportation, it becomes as obligatory upon him to care and provide for them in these respects as their necessities may require, as to provide for them safe vehicles for transportation * * *. And there can be no doubt that if the carrier intrusted with a living animal of any description for transportation, should suffer it to die from starvation or thirst, or for the want of ordinary care and attention in any respect which it required, he would be liable, unless he should be relieved from the duty by contract with his employer." Hutchinson on Carriers, section 323. "In short," says the same author, "the conclusion to be drawn from all the cases upon this subject is that, wherever the situation or con-

dition of the goods, from accident or from any cause, becomes such as to require especial care or attention, the carrier must put himself in the place of their owner and do for them all that might reasonably be expected of a prudent and careful person `* * *`. His contract and his obligation is not only to carry the goods, but to carry them safely; and when they become exposed to the danger of deterioration or destruction from their own inherent infirmity, or from any cause for which the carrier is not accountable, the law makes it his duty to employ at least a reasonable degree of skill and diligence to preserve them, and if he fail to do so, it will be accounted negligence, and he will be liable for the loss, though the actual proximate cause of it may be one for which, but for his own negligence, he would be in no wise responsible." Hutchinson on Carriers, sec. 324.

When, then, defendant received plaintiff's stock at St. Louis, for transportation *via* Kansas City to Oklahoma, there rested on it the duty to exercise a proper diligence in protecting it from damage or destruction, and it can only be relieved of such care as plaintiffs took upon themselves by the terms of their special contract. It was the defendant's duty to stop at reasonable intervals and allow the plaintiffs to feed and water; and of this duty, as already stated, the defendant was not relieved by the terms of the contract of shipment.

While it is true that plaintiffs had no right to designate the time when, or the places where, the train should be stopped and they allowed to water and feed, and that this must of necessity be left to the decision of defendant (*McAlister v. Railroad*, 74 Mo. 351), still, in the light of the undisputed facts of this case, it was defendant's duty to have given plaintiffs an opportunity to unload, feed and water the stock at the yards in Kansas City. The uncontradicted testimony shows

this to have been the uniform and invariable custom in shipments of stock from St. Louis *via* Kansas City, to points west and south thereof; and, besides, it is undisputed that it was so agreed by the parties, at the time of this shipment. This duty, then, was imposed on the defendant, either by an express or an implied contract—express in that the plaintiffs' and defendant's agent at the time orally agreed thereto in terms; or *implied*, in that the parties will be assumed to contract with reference to the established custom. "Evidence of usage comes in to show the intention of the parties in all those particulars which are not expressed in the contract." *Kimball v. Brawner*, 47 Mo. 398; *Evans v. Western Brass Mfg. Co.*, 118 Mo. 553; *Southwestern Frt. Co. v. Stanard*, 44 Mo. 82; *Wolff v. Campbell*, 110 Mo. 119.

It is contended, however, that the bill of lading embodies the entire contract between the parties; that evidence of a parol agreement that the stock should be stopped for feed and water at Kansas City was improperly admitted, and that as to the custom of feeding and watering at that point, it was abrogated by the terms of the express, written contract. If the bill of lading covered this point and declared when and where the stock should be watered and fed, then the objection to oral evidence of what was the agreement in that respect would be well taken, for the writing would be conclusively treated as a correct embodiment of the contract into which all prior verbal negotiations had merged. And if, too, the writing differed in terms from the custom, then clearly the latter must give way to the former. But there is another rule of evidence equally as well settled as the above, and that is, where the instrument of writing does not purport to cover the entire agreement, or a part only of the contract is reduced to writing, then the matter thus left out may

be supplied by parol evidence.   Brown on Parol Evi-
dence, p. 125; *Rollins v. Claybrook*, 22 Mo. 407; *Moss
v. Green*, 41 Mo. 389; *Bunce v. Beck*, 43 Mo. 280;
*Brown v. Bowen*, 90 Mo. 189.   A recognition of this
principle renders admissible the parol evidence in con-
troversy.   The bill of lading was altogether silent on
the point to which such verbal evidence was directed.
It made no provision as to the time or place the stock
should be fed and watered.   This portion of the agree-
ment between the parties was left unnoticed by the
writing.

An inspection of the instructions leads to the con-
clusion that defendant has no substantial reason to
complain, on account of the law given and declared by
the circuit court.   Said instructions were very fair
toward the defendant.   Neither is there cause to com-
plain of the amount of damages awarded by the jury.

The suggestion in brief of counsel that plaintiffs,
at the trial, departed from the cause of action set out
in the petition, is, we think, an unmerited criticism of
that pleading.   Though somewhat clumsily expressed,
the gist of plaintiffs' complaint was fairly declared to
be the negligent failure on defendant's part to furnish
plaintiffs an opportunity to feed and water the stock at
Kansas City, as it had agreed and as was its duty.

In addition to the authorities before noted, it may
be well to cite the following, which tend to sustain
plaintiffs' claim:  *Railway Co. v. Montgomery*, 16 S.
W. Rep. (Texas App.) 178; *Railway Co. v. Ivey*, 23
S. W. Rep. (Texas), 321; *Duvenick v. Railroad Co.*,
57 Mo. App. 550.

There is no substantial error in the record.   The
judgment is for the right party and will be affirmed.
SMITH, P. J., concurs.  ELLISON, J., dissents.